IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

COLEMAN V. LUTNES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WESTON L. COLEMAN, APPELLEE,
V.
ANN LUTNES, APPELLANT.

Filed July 2, 2013.    No. A-12-993.

Appeal from the District Court for Box Butte County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Leonard G. Tabor for appellant.

A. James Moravek, of Curtiss, Moravek & Curtiss, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

INBODY, Chief Judge.

### INTRODUCTION

Ann Lutnes appeals the determination of the Box Butte County District Court modifying the parties' custody agreement by awarding Weston L. Coleman legal and physical custody of the parties' minor child. The court further denied Lutnes' request to remove the minor child to Virginia and ordered her to pay child support. Because we cannot say that the district court abused its discretion in these determinations, we affirm.

### STATEMENT OF FACTS

Coleman and Lutnes were previously involved in a relationship from which a minor child, Emily Coleman, was born in August 2008. Not long after, the parties separated and Coleman filed a complaint to establish paternity in order to retain visitation with Emily after Lutnes took a trip to visit her father in North Dakota and did not return to Nebraska. During the proceedings, Lutnes was found in willful contempt for denying Coleman visitation.

- 1 -

Thereafter, the parties stipulated to the issues of custody, visitation, and child support. Lutnes was awarded physical custody of Emily, and Coleman was awarded 2 weeks of visitation each month, in addition to other visitations during holidays and the summer months. Lutnes and Coleman met in South Dakota to exchange Emily for visitation. Coleman agreed to pay $510 per month in child support, and a child support worksheet calculation was attached to the stipulation.

In May 2011, Lutnes filed a motion to modify previous court orders, alleging that there had been a material change in circumstances and also requesting permission to remove Emily from North Dakota to Virginia. Coleman filed an answer denying Lutnes' allegations and counterclaiming for the legal and physical custody of Emily, for the court to deny Lutnes' request to remove Emily, and for child support. Coleman alleged that Lutnes was again denying visitations with Emily. In September 2012, trial was held on motions, during which numerous witnesses testified. At the time of the trial, Emily was 4 years old.

Lutnes testified that she was currently employed as a drill pipe inspector for the oil industry and lives in Williston, North Dakota. Lutnes has been employed with a company for 1 year and earned approximately $17 per hour. In the past 4 years, Lutnes had been employed at four different jobs and had three different physical residences. Lutnes testified that, on average, at her current employment, she works 16 hours a day, 7 days a week. Lutnes resides in a 1-bedroom apartment provided by the company. The apartment is one facility, split into two separate living areas, and Lutnes testified that she has a male roommate who lives in the other area, but that they work different shifts and rarely see each other. On cross-examination, Lutnes mentioned that she had previously dated this roommate, but that he was not her boyfriend. Lutnes pays no rent or utilities at the company residence. Emily does not live with Lutnes because of her work schedule and because company policy does not allow it. Lutnes explained that Emily will spend the night with her over the weekends and on days that Lutnes is sick and unable to work.

Lutnes explained that she requested permission to leave North Dakota and move to Virginia with Emily in order to find better employment and spend more time with Emily, although if denied her request to move, she would not attempt to find different employment in North Dakota. Lutnes testified that she would agree to split transportation costs with Coleman if she were allowed to move, although she explained she would not allow Emily to fly by herself at any time and would prefer to meet at a halfway point.

Lutnes was unable to testify as to where Emily was attending school and explained that it was because she had not ever picked her up from the school. Lutnes receives $510 per month in child support from Coleman and gives all of that child support to her aunt, Terri Lutnes, with whom Emily lives. In 2010, Emily lived with Coleman in Alliance for 4 months, and Lutnes testified that she did not visit Emily at all during that time. Several medical bills and records were received into evidence, and on most occasions, Lutnes did not know what the services were for or testified that Terri had taken Emily to the doctor. Several times during cross-examination, Lutnes referred medical questions regarding Emily to Terri because she did not know. Lutnes explained that she was only with Emily "periodically" and that Terri spent the most time with Emily.

Lutnes testified that when she is able to spend time with Emily, they go to the park, play outside, work on vocabulary words, and cook, and that Emily also helps Lutnes clean her

apartment. Lutnes testified that when Emily is in North Dakota, her health is "steady." But when she visits with Coleman, Lutnes explained that she is always different, such as being more angry or sad. Lutnes observed that, over the years, Emily would return from Coleman's and have a difficult time with her vocabulary and would stutter her words, a trait which Lutnes testified was abnormal for Emily when she was in North Dakota. Lutnes also explained that Emily would significantly regress with her potty training after returning from visitation.

Lutnes admitted that in the last 2 years she had denied Coleman visitation with Emily. Lutnes explained that if Coleman were to call her cellular telephone, he would rarely be able to speak with Emily because she is not usually in Lutnes' physical care. Lutnes testified that Coleman often tries to change or modify the visitation schedule and that the schedule is not working because it causes financial hardship on both parties, even though she is the one who chose to move from Nebraska to North Dakota. Lutnes testified that each time she is required to pick up or deliver Emily, she loses money. Lutnes testified that the weather also affects visitations, in that she has run into bad weather from the north and south. In her testimony, Lutnes and her family members raised questions concerning an occurrence of alleged abuse upon Emily by Coleman. The record indicates that the allegations of abuse were investigated and unfounded and proved that Emily had actually experienced yeast infections caused by urinary tract infections.

Lutnes' father, Keith, testified that he lives with his sister Terri, who, he indicated, provides daycare to Emily only four to five times a week while Lutnes works. Keith indicated that he frequently transports Emily to meet Coleman for visitations and explained that Emily always gets sick in the car on the way to those visits. Keith testified that Emily's behavior is different when she returns from visits with Coleman in that she is abusive toward children her age and uncooperative. Keith testified that Emily has pinched his nipple and indicated that "Daddy does it." Keith indicated that Lutnes and Emily were bonded. Several other family members testified on Lutnes' behalf, echoing Keith's testimony that Emily acts differently after visitations with Coleman and that Lutnes and Emily share a bond.

Lutnes' aunt, Terri, testified that she currently lived in Williston with her brother Keith. Terri testified that she operates an inhome daycare with approximately five children. Terri explained that Emily has her own bedroom in her home because Lutnes works many hours. Terri explained that Lutnes is appropriate with Emily and also that she has observed that Emily becomes "a very angry little girl" when she returns from visits with Coleman, is overly concerned about making messes, and is very aggressive. Terri indicated that Emily is scared of the dark, which she was not previously.

Lutnes' sister, Jesse Querl, testified that she works for the federal government and resides in Falls Church, Virginia, which is located near Washington, D.C. Querl has been assisting Lutnes in finding employment in the area and testified that Lutnes had an employment offer with Kael Jordans Think Group Company as a Tier I help task support technician, earning $82,000 per year. Querl explained that airline tickets from Virginia to Alliance, Nebraska, cost approximately $1,200 to $1,500 for a round trip ticket and consisted of several stops. Querl testified that if Lutnes were allowed to move with Emily to Virginia, she would be able to provide Lutnes and Emily with support, and that other family members lived in the area. Querl testified that there is a Montessori school in the area that operates from 9 a.m. to 7 p.m., which

would provide Emily with education and daycare services. Querl indicated that she secured a hold on an opening for Emily at the Montessori school. Querl also indicated that she would like Lutnes and Emily to reside with her until they could find a home, which process they have already begun.

Coleman testified that he owns his own home, which he lives in with his girlfriend, Felicia Wilkins, and Emily when she visits, in Alliance. Coleman is a work leader at a company, where he was hired in 2000. Coleman testified that he experimented with various illegal substances in college, but that he had not taken any substances since he and Lutnes separated in 2008. Coleman explained that he is current with his child support payments and provides Emily's health insurance. Coleman testified that he was requesting full custody of Emily. He explained that he spends time with her playing outside, going to the mall, and traveling and that they spend time together each day. Coleman testified that if he were granted custody, Emily would attend a preschool, and that there is a grade school one block from his home.

Coleman testified that Emily is afraid of the dark, but that he does not know why, so he talks to Emily about it and places a nightlight in her room. Coleman testified that Emily will occasionally catch a cold while playing with cousins during visitations, but that he always discusses the symptoms with whoever is picking Emily up. Likewise, Coleman testified that Emily has been sick on occasions that he has picked her up, but that he understands that children get sick and did not ever blame Lutnes. Coleman testified that contrary to Lutnes' testimony, he has never abused Emily.

Coleman explained that there had been significant difficulties with Lutnes and communicating about many issues regarding Emily such as visitation and doctor visits. Coleman testified that he has always wanted more visitation time with Emily and that when he requested the time, Lutnes would promptly deny the request, indicating that they must "do what the paperwork says." Coleman testified that he opposed Lutnes' moving to Virginia with Emily because it would negatively affect his visitation time and his relationship with Emily.

Wilkins testified that she has known Coleman for 10 years and began dating him 3 years ago. Wilkins indicated that she and Coleman had lived together for 2 years and would be married in September 2012. Wilkins frequently cares for and spends time with Coleman and Emily, explaining that they golf; go to parks; spend time with family, which includes numerous cousins; and ride bikes. Wilkins testified that Emily is normally very happy and excited to see Coleman and also cries when she has to leave visitations with him. Wilkins explained that on most occasions, Emily is transported to visitations by Terri.

Several of Coleman's family members, such as his mother and sister, and Wilkins' father testified as to the family support system they have in place in Alliance and of their contact with Emily. Coleman's mother testified that she frequently spends time with Emily when she is at Coleman's for visitations. She explained that Coleman takes good care of Emily and appropriately raises and disciplines her. She explained that if Coleman is granted custody of Emily, she would continue to provide familial support.

At the conclusion of the trial, the district court entered a journal entry and order finding that there had been a material change in circumstances due to the visitation schedule and current working arrangements of the parties. The district court awarded Coleman legal and physical custody of Emily and terminated his child support obligation. Lutnes was awarded visitation and

ordered to pay 50 percent of transportation expenses for Emily should Lutnes move to Virginia. The district court found that Coleman had not forfeited his parental rights and was not unfit, and it further ordered Lutnes to pay $730 per month in child support. The district court then denied Lutnes' motion to remove Emily to Virginia with no additional findings. It is from this order that Lutnes has timely appealed.

## ASSIGNMENTS OF ERROR

Lutnes assigns that the district court abused its discretion by finding a material change in circumstances and awarding Coleman custody of the parties' minor child, by denying her request to remove the child to Virginia, and in its order for child support. We would note that, in the assignments of error section, Lutnes indicates that, along with the district court's child support determination, she should have been ordered a partial abatement of support during the time the child will be with her. However, the brief contains no further argument regarding abatement within Lutnes' arguments; aside from her conclusion where she again indicates that the court erred by not allowing an abatement. Since she has failed to specifically argue the issue of abatement, we will not address that assignment of error. See *In re Estate of Cushing*, 283 Neb. 571, 810 N.W.2d 741 (2012) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error).

## STANDARD OF REVIEW

Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009).

## ANALYSIS

*Change in Custody.*

Lutnes argues that the evidence was insufficient to find a material change in circumstances warranting the district court to award Coleman sole custody of Emily.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002). The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id*. A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id*.

In this case, the district court did not find that either Coleman or Lutnes was unfit, but instead based its determination upon the best interests of the child. Since the entry of the parenting agreement between Coleman and Lutnes, there have been several circumstances which might have persuaded the district court to decree differently than was approved in 2009. Since that time, Lutnes has remained in North Dakota, but has had four different jobs and lived in three different residences. The most unusual circumstance is that Lutnes has custody of Emily, but the record indicates that she spends little to no time with her. Lutnes works 16-hour shifts, 7 days a

week, and lives in a company-owned unit. Emily is not allowed to live with Lutnes and instead lives with Terri. Lutnes did not have much, if any, knowledge about Emily's medical history, other than those complaints she maintained of Emily's returning from visitations sick; Lutnes did not know where Emily attended school or her school schedule; had never picked her up from school; and for most information about Emily, Lutnes directed counsel to refer to Terri. Lutnes pays no rent or utilities and forwards the child support payments entirely to Terri for Emily's support. Lutnes testified that if she was denied the court's permission to remove Emily to Virginia, she would not look for different employment.

It is true that Emily's extended family in North Dakota is very supportive and caring, insomuch as they are essentially raising Emily in Lutnes' place; however, the record indicates that Emily also has a significant amount of extended family in Alliance and that Coleman has maintained a significantly more stable environment for Emily. Coleman has maintained the same employment and resides in a home with Wilkins, who is also closely involved with Emily. Coleman is aware of Emily's educational needs, has found a preschool for her to attend, and resides one block from the grade school which she would attend. Coleman knows who Emily's medical providers are and appears to try and maintain an amicable line of communication with Lutnes.

On the other hand, the record indicates that although both Coleman and Lutnes love and care for Emily, Coleman is essentially intolerable to Lutnes. There was no indication that Lutnes has fostered Emily's relationship with Coleman, evident from the numerous times in which she had denied extra visitation and in several cases denied visitation all together. None of Lutnes' family members had any positive viewpoints about Coleman, while Coleman's family indicated that Emily's relationship with Lutnes was important. And it appears that communication between Lutnes and Coleman had all but ceased, as Coleman sought out Terri if he needed to communicate with Emily.

Weighing all of the factors in the context of this court's de novo review as we are required to do, we cannot say that the trial court abused its discretion in finding that there was a material change of circumstances warranting a change of permanent physical custody of Emily from Lutnes to Coleman and that such change was in Emily's best interests. This assignment of error is without merit.

*Removal.*

Lutnes argues that the trial court erred by denying her request to remove Emily from North Dakota to Virginia; however, having determined above that the district court did not err in granting Coleman sole custody of Emily, we need not address this assignment of error. See *In re Trust Created by Hansen*, 281 Neb. 693, 798 N.W.2d 398 (2011) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it, and thus need not address issue that is not material to disposition of appeal).

*Child Support.*

Lutnes challenges the district court's child support calculation ordered in the amount of $730 per month, arguing that overtime should not be reflected in the calculation.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). The guidelines provide

that in calculating child support, a court must consider the total monthly income of both parties. Neb. Ct. R. § 4-204; *Simpson v. Simpson*, 275 Neb. 152, 744 N.W.2d 710 (2008). Section 4-204 of the guidelines defines total monthly income as income "derived from all sources, except all means-tested public assistance benefits which include any earned income tax credit and payments received for children of prior marriages." Section 4-204 further provides that a court may consider overtime wages in child support determinations if the overtime "is a regular part of the employment and the employee can actually expect to regularly earn a certain amount of income from working overtime."

In this case, the district court took into account that overtime rate in determining both parties' total monthly incomes. The district court assigned Coleman with a total monthly income of $4,000. The record contains evidence that Coleman earned approximately $17 to $18 per hour, regularly working 40 hours per week, in addition to overtime pay, averaging anywhere from 6 to 10 additional hours per week, at a rate of $27.47 per hour. Coleman did not testify regarding overtime pay, but as noted, all of his paychecks received into evidence indicate overtime hours. Coleman has been employed with the same company since 2000.

Similarly, the record contains evidence that Lutnes earns $17 per hour for 40 hours per week, in addition to overtime pay in the amount of $25.50 per hour. However, as Lutnes testified and the record reveals, Lutnes regularly worked significantly more hours of overtime, generally amounting to 30 to 45 additional hours per week. Lutnes testified that she works 16-hour days, 7 days a week, and that those long hours would not change as they were a product of employment in the oil industry. Lutnes further testified that if she were not allowed to move to Virginia with Emily, she would not look for a new job, which would indicate that she had no reason to believe that the availability of her working overtime hours would be reduced in the future.

Based on the evidence presented to the district court, we cannot say that the district court abused its discretion by including overtime wages in the calculation of the parties' incomes.

CONCLUSION

In sum, upon our de novo review of the record, we find that the district court did not abuse its discretion by finding that a material change in circumstances had occurred warranting a change in Emily's custody. In light of this determination, we decline to address Lutnes' assignment of error regarding the denial of her motion for removal. We also find that the district court did not abuse its discretion by including overtime wages in the child support calculation.

AFFIRMED.